SARTAIN, Judge.
This is one of three suits consolidated for trial in the district court. The incident giving rise to these actions was a collision between a 1968 Cadillac automobile owned .and driven by Emile M. Weber and a 1968 Volkswagen vehicle owned by University Volkswagen, Inc., and driven by Leo S. Peavy. Accompanying Mr. Peavy as a guest passenger was George H. Gardner. Aetna Life and Casualty Company (Aetna) provided Mr. Weber with general liability and uninsured motorist (U.M.) coverage.
Messrs. Peavy and Gardner each sued Mr. Weber and Aetna in tort, which actions were defended on the grounds that the accident was the result of the conduct of an unidentified motorist driving a white pickup truck in forcing Mr. Weber to lose control of his vehicle and, alternatively, that Mr. Peavy had the last clear chance to avoid the accident. Mr. Weber in turn sued Aetna under the U.M. provisions of its policy, and alternatively sued Peavy and University Volkswagen, Inc., in tort.
The trial judge found for Peavy and Gardner and rejected the defenses of Aet-na and Mr. Weber, and more particularly rejected the demands of Mr. Weber against his own insurer and against Peavy and University Volkswagen. The Peavy and Gardner suits for their damages were not appealed. Mr. Weber has prosecuted this appeal contending that the trial judge erred in denying his claims against Aetna or Peavy. We affirm.
Appellant contends that the trial judge erred in the following three respects: (1) in failing to find that appellant’s testimony, “uncontradicted and without rebuttal”, was sufficient to sustain his burden of proof as against Aetna; (2) alternatively, in failing to find that Peavy had the last clear chance to avoid the accident; and (3) in finding that appellant “was guilty of negligence which was a proximate cause of the accident.”
The accident occurred at approximately 1:30 p. m. on August 6, 1968, on Interstate *630 Highway Ten (I — 10) in East Barton Rouge Parish. I — 10 at this juncture runs in an east-west direction, with three lanes of travel for traffic traveling in each direction and separated by a curbed, grass median or neutral ground, perhaps fifteen to twenty feet wide. Just east of the point of collision is an up-ramp or approach permitting westbound traffic to enter I — 10 from Perkins Road. This is shown in photographic evidence to be a curved approach which first passes under and then rises to the elevated level of I — 10.
The testimony of Messrs. Peavy, Gardner and Weber is in substantial conflict relative to the speed of their respective automobiles, evasive actions attempted and whether one or the other was stopped at the point of collision.
Mr. Weber testified that he was traveling west in the inside lane of I — 10 at a speed of about 50 to 60 m. p. h. and as he was abreast of the point where the Perkins Road up-ramp joined I — 10 a white pick-up truck entered the flow of traffic and began to fade toward the inside lane instead of straightening out in the middle or outside lane. Mr. Weber said he reduced his speed to 40 to 50 m. p. h., hoping to allow the truck to pass in front of him, but the truck also slowed and continued to fade into his lane. He was eventually forced into the curb, lost control of his automobile and commenced a skid of about three hundred feet on the grass of the neutral ground. At the time he hit the curb, he was just reaching the edge of a heavy thundershower. He then left the neutral ground and ended up facing north across the inside east-bound lane. He said he was stopped for two or three seconds and saw the Volkswagen at a distance of 200 to 250 feet away coming at him. He tried to move his car forward, back on to the neutral ground, but his motor stalled and the Volkswagen struck his car in the middle of the left side or around the driver’s door. Mr. Weber told an investigating officer that he had been forced into the curb by a white car or truck but was not certain thart there was any contact between the two vehicles. (All witnesses and officers admitted that they did not scrutinize the right side of the Cadillac and the trial judge found that the photographs and moving pictures taken at the scene were inconclusive as to any damage to the right side.) Thereafter, in a repair shop a small dent was noticed on the middle of the right front fender of the Cadillac. Although the paint was not broken, Mr. Weber insists that it was not there before the accident and must have been caused by contact with the white pick-up truck.
Mr. Peavy and Mr. Gardner testified that they were traveling at about 40 to 50 m. p. h. in the inside east-bound lane and had just crossed the span over City Park Lake. They were just passing through a thundershower but visibility ahead was not affected. Mr. Gardner said he saw the Weber vehicle strike the curb and go out of control at a distance ahead which he estimated to have been 150 to 200 feet and he called this fact to Mr. Peavy’s attention. But almost simultaneously Mr. Peavy noticed the Weber vehicle in the skid and was already starting to brake when Mr. Gardner shouted his warning. Mr Peavy estimated the distance ahead, when he first saw the Weber car, to have been 100 to 150 feet. Each man thought that Peavy had either stopped or was going less than five miles per hour when the collision occurred. * It was their testimony that the Cadillac was still skidding and actually ran into them. Each man said there was a normal amount of traffic on I — 10 and Mr. Peavy said not only was there other traffic in the lanes to his right, but also he had no time to do anything other than step on his brake as soon as he saw the apparent hazard. Neither man remembered seeing a white pick-up truck or any other vehicle in Mr. Weber’s vicinity but neither man was particularly looking in that direction until the Cadillac had begun to go out of control.
Major Ray Heard, the supervisor of the Louisiana State Police Crime Laboratory, *631 was accepted by the court as an expert witness in the field of accident analysis. It was his opinion that both automobiles were moving and at a significant speed at the time of the collision. He explained his opinion in the following manner:
“Q. Now in the photographs that we have introduced, we have some of the vehicle after the accident that you have examined. What is your opinion as to whether or not the Cadillac automobile was moving at the time of this accident at POC (point of collision) ?
“A. After studying the photographs it appears to me that the point of impact is in the near vicinity of the, underneath the right front of the Cadillac. Most of the debris is in that area. And the point of impact indicates that it was hit at approximately right angles by the Volkswagen. Now for the Cadillac to be in the area of the point of impact then it would have had to have been moving to prevent it from being forced down the road a few feet by the impact itself. The Volkswagen appears to me to be going somewhere in the vicinity of forty miles per hour due to the damage. This is based on the knowledge — experience. If it was going sixty it would just about demolish it, it couldn’t have been going as little as twenty or it would not have done anywhere close to this amount of damage, but at a speed of forty miles an hour even if the Volkswagen hit the Cadillac and it was stopped, then it would have scooted a distance from the point of impact of about fifteen or twenty feet. Now if the point of impact is actually under the front of the Cadillac then it had to be moving at the time of this impact. And also the fact that the Cadillac is moved seven or eight feet or so from the center of impact of the Volkswagen also indicates that it was moving at the time. Now if the Volkswagen — if these vehicles are in the spot approximately where they hit and the Volkswagen was going forty miles an hour, then the Cadillac would have been traveling twenty miles an hour to offset the force of the Volkswagen, in other words, the concentration of momentum for them to be at the same spot. This is based on the fact that the weight of the Cadillac is approximately twice that of the Volkswagen.”
Major Heard also testified that if the Cadillac had skidded 300 feet on the wet grass of the neutral ground and if it had been stopped at the time of the collision, then Mr. Weber’s speed at the moment he hit the curb would have been about 65 to 67 miles per hour. In these computations, Major Heard used what he called a conservative figure for a coefficient of friction on the wet grass of 0.5. If this factor were greater, his estimate of the initial speed would have been higher. He did not consider, in making his estimate, the fact that the Cadillac was not stopped but was actually skidding on the wet pavement (which he said would have a coefficient of friction of about 0.75) at a significant rate of speed at the point of collision. It logically follows that Mr. Weber’s initial speed, when he hit the curb, was not 40 to 50 m. p. h. as he estimated but was a minimum of 65 miles per hour.
The trial judge found as a fact that a speed of 65 m. p. h. was unreasonable under the traffic and weather conditions and was above the posted speed limit of 60 miles per hour. The judge found that Mr. Weber’s negligence in speeding was a proximate cause of the accident, irrespective of any alleged negligence on the part of a white pick-up truck. The court concluded that Mr. Weber had not sustained his burden of proving his own absence of *632 fault in being in the wrong lane, and cited the following authority:
“The law is well settled that the driver of the vehicle determined to be in the wrong lane of travel is presumed to be negligent, and he had the burden of showing that the collision was not caused by his negligence, or that there were justifiable circumstances excusing his conduct.” Rollins v. New York Fire & Marine Underwriters, Inc., 225 So.2d 663, 666 (3rd La.App.1969).
We agree that Mr. Weber did not rebut the adverse presumption of negligence and we find no error in the conclusion that his speed was a proximate cause of the accident. Mr. Weber’s claim against Aetna under the U.M. coverage in its policy was properly denied.
We also find that Mr. Weber failed to prove the applicability of the doctrine of last clear chance. The physical evidence as interpreted by Major Heard does not corroborate Mr. Weber’s contention that he was stopped for a few seconds and that Mr. Peavy had sufficient time and distance in which to take some action to avoid the collision, that is, that by the exercise of ordinary, reasonable care, Mr. Peavy could have avoided the accident after the time when he recognized or should have recognized the peril. Mr. Peavy was suddenly confronted with an emergency situation and was unable to bring his car to a stop in his lane before the impact. He said that other traffic prevented him from swerving to his right. We are not persuaded that Mr. Peavy’s actions constituted negligence or that he had a safe alternative course or action to choose in order to avoid this accident.
For the above and foregoing reasons, the judgment of the trial court is affirmed, at plaintiff-appellant’s costs.
Affirmed.